J-S23022-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| HARTLEY BUTCH B. WARREN | : |
| | : |
| Appellant | : No. 626 EDA 2025 |

Appeal from the Judgment of Sentence Entered August 4, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008777-2019

BEFORE: LAZARUS, P.J., MURRAY, J., and FORD ELLIOTT, P.J.E.*

MEMORANDUM BY MURRAY, J.: **FILED AUGUST 13, 2026**

Hartley Butch B. Warren (Appellant) appeals, *nunc pro tunc*, from the judgment of sentence entered following his jury conviction of involuntary deviate sexual intercourse - person less than 16 years old (IDSI), statutory sexual assault, unlawful contact with a minor, and endangering the welfare of a child (EWOC).[1] After careful review, we affirm.

The trial court provided the following summary of the facts underlying Appellant's conviction:

> When the complainant, R.R., was 14 years old, her mother became ill and unable to care for her, so R.R. was sent to live with family in North Carolina, which included R.R.'s older half-sister[, Charon Hudson (Charon),] and her husband, Appellant …. During this time, R.R.'s mother passed away. Following the death of her

---

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3123(a)(7), 3122.1(b), 6318(a)(1.2), 4304(a)(1).

mother, R.R.'s behavior at home and at school changed for the worse. It was during this same time period that Appellant began to make sexual comments to R.R., eventually escalating to performing oral and vaginal intercourse.

In August of 2016, when R.R. was 15 years old, the family went on vacation, stopping in Philadelphia on the way home. Appellant took R.R. and his young daughter to his sister's house in Philadelphia, where he removed R.R.'s pants, licked her anus and vagina, then inserted his penis in[to] her vagina.

They returned to North Carolina the next day, where Appellant continued to sexually abuse R.R.

In December of 2016, R.R. complained that Appellant and his wife (R.R.'s sister) were denying her food. The North Carolina [Department of Health and Human Services (DHHS)] conducted an investigation, which was closed with no recommendation of social services. Subsequently, on New Year's Eve, while on a Christmas holiday visit to family in Philadelphia, R.R. showed her cousin[, T.], who was about her same age, sexually suggestive text messages from Appellant. The two girls then went downstairs to speak to their older cousin, Veronica, at which point R.R. stated that Appellant had been having sexual intercourse with her. Veronica then took R.R. to the local police station, where they were told she needed to report the conduct to police in North Carolina, where the most recent incidents had occurred.

The family [] reported the allegations to the county sheriff's office in North Carolina, which conducted an investigation, including R.R. traveling from Philadelphia for an interview. In July of 2017, the investigation was concluded without charges being filed. In 2019, at the urging of family, R.R. went to police in Philadelphia[,] where an investigation was opened, eventually resulting in charges against Appellant for the August 2016 sexual abuse in Philadelphia, when [R.R.] was 15.

Trial Court Opinion, 7/29/25, at 2-3 (punctuation modified).

A jury subsequently convicted Appellant of the above-described charges. On August 4, 2023, for his conviction of IDSI, the trial court sentenced Appellant to 4-8 years in prison, followed by four years of

probation. For his conviction of statutory sexual assault, the trial court sentenced Appellant to a concurrent prison term of 4-8 years, followed by four years of probation. For his conviction of unlawful contact with a minor, the trial court sentenced Appellant to a concurrent 4-8 years in prison followed by four years of probation. Finally, for Appellant's conviction of EWOC, the trial court imposed no further penalty. Appellant did not file a direct appeal.

Appellant timely filed a Post Conviction Relief Act ("PCRA")[2] petition on April 24, 2024, seeking, *inter alia*, reinstatement of his direct appeal rights, *nunc pro tunc*. The PCRA court granted Appellant's petition on October 24, 2024, and permitted Appellant to file post-sentence motions and pursue a *nunc pro tunc* direct appeal.

Appellant filed a post-sentence motion on November 2, 2024, which the trial court denied on January 27, 2025. Appellant timely filed a *nunc pro tunc* notice of appeal. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

(1) Did the trial court err in terminating the direct examination of defense witness [Charon]?

(2) Did the trial court err in instructing the jury to disregard any argument regarding the investigative conclusions of both the North Carolina Sheriff's Department & [DHHS]?

(3) Were the jury's verdicts against the weight of the evidence presented at trial?

_____

[2] 42 Pa.C.S.A. §§ 9541-9546.

Appellant's Brief at 6 (formatting and punctuation modified).

Appellant first claims the trial court improperly curtailed Charon's testimony, thereby abusing its discretion and causing Appellant prejudice. *Id.* at 14. Appellant claims the trial court's

> abrupt termination of [Charon's] direct examination both created an unfavorable inference regarding [Charon's] testimony before the jury, and unfairly limited the scope of her testimony, the details of which were essential to evaluate the veracity of R.R.'s testimony.

*Id.* This is the entirety of Appellant's argument.

Appellant's first claim is unsupported by citations to the record and includes no citations to relevant authorities supporting his claim of error. We observe the requirements of Pennsylvania Rule of Appellate Procedure 2119:

> [t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part-- in distinctive type or in type distinctively displayed--the particular point treated therein, **followed by such discussion and citation of authorities as are deemed pertinent**.

Pa.R.A.P. 2119(a) (emphasis added). Rule 2119 further requires that the argument must set forth "a reference to the place in the record where the matter referred to appears." Pa.R.A.P. 2119(c).

As our Supreme Court has stated,

> an appellant bears the burden of sufficiently developing his arguments to facilitate appellate review. [O]ur rules of appellate procedure are explicit that the argument contained within a brief must contain such discussion and citation of authorities as are deemed pertinent. Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority[,] or fails to develop the issue in any other meaningful fashion capable of

review, that claim is waived. It is not the obligation of an appellate court to formulate [an] appellant's arguments for him….

*Commonwealth v. Armolt*, 294 A.3d 364, 376-77 (Pa. 2023) (citations and quotation marks omitted); *see also* Pa.R.A.P. 2119(a). Similarly, this Court has stated,

[w]hen an appellant's argument is underdeveloped, we may not supply it with a better one. In such situations, [w]e shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem the issue to be waived.

*Commonwealth v. Pi Delta Psi, Inc.*, 211 A.3d 875, 884-85 (Pa. Super. 2019) (citation and quotation marks omitted).

Because Appellant failed to comply with our Rules of Appellate Procedure, we deem his first issue waived. However, even if Appellant had not waived his first issue, no relief is due.

The admission of evidence

is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015) (quotation marks and citations omitted).

A trial court also has discretion to control the mode and order of examining witnesses and presenting evidence so as to "(1) make the procedures effective for determining the truth; (2) avoid wasting time; and

(3) protect witnesses from harassment or undue embarrassment...." Pa.R.E.

611(a)(1)-(3).

Instantly, in its opinion, the trial court addressed Appellant's issue and

concluded it lacked merit:

> A review of the record demonstrates that the [trial court] appropriately limited evidence and controlled defense counsel's examination of [Charon] to avoid repetition, and to limit examination on irrelevant or collateral matters. Specifically, defense counsel attempted to elicit testimony about the [R.R.'s] behavior. The court ruled that the testimony was collateral and directed that it be limited. Nonetheless, the court allowed some testimony about [R.R.'s] behavior at school and at home. N.T., 4/20/23, at 47-49. The court determined that the testimony was collateral and "barely relevant, if at all" and directed counsel to move on. *Id.* at 50.
>
> Despite this ruling, defense counsel continued to attempt to elicit such collateral behavior evidence, despite repeated admonishments from the court to limit the inquiry and move on. *Id.* at 50, 57, 60-61, 63. Finally, the court had no choice but to terminate counsel's examination, during the following exchange:
>
>> [DEFENSE COUNSEL]: Okay. If you could just give us a summary overall of how her behavior was during the entire?
>>
>> [THE COMMONWEALTH]: Objection.
>>
>> THE COURT: Sustained. Maybe that is the last question .... It doesn't seem to me there are any relevant questions for this witness. Cross examination please.
>>
>> [DEFENSE COUNSEL]: I would like to –
>>
>> THE COURT: Cross-examination.
>>
>> [THE COMMONWEALTH]: … Good morning ….
>>
>> [DEFENSE COUNSEL]: I would like to –

THE COURT: We are on cross.  No.

[DEFENSE COUNSEL]: I'm moving onto another topic.

THE COURT: Before I warned that if we got back into that area –

[DEFENSE COUNSEL]: I'm not going back –

THE COURT: --notwithstanding my many requests.

[DEFENSE COUNSEL]: I understand.

THE COURT: This is an instruction before you started it again, and I said, "I mean that," and you went ahead and did it.  So, you know, what can I do?  Cross-examination.

[DEFENSE COUNSEL]: Judge, I have another area.  Can I see you at sidebar?

THE COURT: You didn't do it before I asked you to go into another area many times, right?  It only changes if I do something.  So now I'm doing something.

[DEFENSE COUNSEL]: I object to you terminating cross-examination.

THE COURT: I understand.  Your objection is reflected on the record.  Cross-examination.

*Id.* at 63-65.

When defense counsel persistently demonstrated an inability to follow the court's direction, the court was compelled and authorized to end the examination.  And even so, defense counsel was given latitude in examining the witness on re-direct.  *Id.* at 75-78.

…[T]he court properly exercised its discretion in controlling the examination of this witness.  Moreover, to the extent the collateral issues of the complainant's behavior had any relevance, the behavior evidence was adequately presented to the jury through

this witness, as well as cross-examination of R.R. Thus, Appellant is unable to demonstrate any prejudice.

Trial Court Opinion, 7/29/25, at 9-10. Thus, even if Appellant had not waived this issue, our review discloses no error or abuse of the trial court's discretion. Consequently, Appellant's issue merits no relief.

In his second issue, Appellant argues that the trial court improperly instructed the jury to "disregard argument regarding the investigative conclusions of [DHHS]." Appellant's Brief at 15. Appellant explains that the Commonwealth filed a Pa.R.E. 404(b)[3] motion to introduce evidence regarding Appellant's prior abuse of R.R. in North Carolina. *Id.* Appellant acknowledges he did not oppose the motion, and it was "granted by agreement on March 27, 2023." *Id.* However, Appellant points out that at trial,

> stipulated evidence was introduced regarding investigations made by both the North Car[o]lina Sheriff's Department and [DHHS] related to the abuse, sexual and [other allegations] , made by R.R.

_____

[3] Rule 404(b) provides, in relevant part, as follows:

> **(1) *Prohibited Uses.*** Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> **(2) *Permitted Uses.*** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

> These stipulations included the investigation's conclusory results, stating that at the conclusion of the respective investigations[,] [] social services were [not] recommended nor criminal charges filed.

*Id.*

Appellant claims that defense counsel "had a duty to argue the reasonable and common-sense inferences to be derived from the stipulated evidence[.]" *Id.* Appellant argues the trial court improperly sustained the Commonwealth's objection, which also sought to limit Appellant's response to this stipulated evidence. *Id.* at 16. Appellant further asserts the trial court erred by issuing a jury instruction that prejudiced Appellant, and undermined a portion of his counsel's closing argument to the jury. *Id.*

Although Appellant explains his argument, he fails to provide this Court with citations to the record and legal authorities that support his claim. For this reason, we deem Appellant's issue waived. *See* Pa.R.A.P. 2119(a) (requiring an appellant to discuss and cite to pertinent authorities); *see also Armolt*, 294 A.3d at 376; *Pi Delta Psi, Inc.*, 211 A.3d at 884-85. Regardless, even if Appellant had developed this claim, we would conclude it lacks merit.

In reviewing a challenge to the jury charge, we determine whether the trial court abused its discretion or committed an error of law that controlled the outcome of the case. *Commonwealth v. Focht*, 334 A.3d 931, 937 (Pa. Super. 2025).

As this Court has explained,

- 9 -

the prosecution and the defense alike are afforded wide latitude and may employ oratorical flair in arguing to the jury. However, the arguments of counsel are not evidence. The arguments advanced by counsel must be based upon matters in evidence and/or upon any legitimate inferences that may be drawn from the evidence. The trial court must frame the legal issues for the jury and instruct the jury on the applicable law. The trial court may, at its discretion, limit the scope of counsel's arguments to the jury to correct a possibly misleading statement of the law.

***Commonwealth v. Reich***, 340 A.3d 997, 1013 (Pa. Super. 2025) (citations, brackets, and quotation marks omitted).

Instantly, the trial court issued an instruction regarding the parties' stipulation. When reviewing a challenge to a jury instruction,

we review the charge as a whole to ensure it was a fair and complete statement of the law. Trial courts possess great discretion in phrasing jury instructions so long as the law is clearly, adequately, and accurately presented to the jury. [A] trial court need not accept counsel's wording for an instruction, as long as the instruction given correctly reflects the law….

***Commonwealth v. Towles***, 106 A.3d 591, 607 (Pa. 2014) (quotation marks and citations omitted).

At trial, the following stipulation was presented to the jury:

[THE COMMONWEALTH]: And there is a stipulation by and between counsel that [R.R.], the complainant herein, made a report of neglect on December 1, 2016, to Wilson County, North Carolina, [DHHS] against [Charon], and Appellant, … alleging that [R.R.] was subjected to neglect by their denial of food to her.

This matter was investigated, and the investigation was closed with no social services recommended as of December 19th of 2016.

There is a second stipulation that on January 1st of 2017, [R.R.], the complainant herein, reported that she had been sexually assaulted by [Appellant].

- 10 -

The Wilson County, North Carolina, Sheriff's Office, Detective J.L. Jackson, was assigned to conduct an investigation. The investigation concluded July 20th, 2017, with no charges filed and the case closed.

THE COURT: So stipulated, Counsel?

[DEFENSE COUNSEL]: Yes.

THE COURT: All right.

N.T., 4/19/23, at 222-23.

During closing argument, Appellant's counsel referred to the stipulation, arguing as follows:

So there is another stipulation that [in] January 2017, [R.R.] reported she had been sexually assaulted by [Appellant, which] was reported to the Wilson County North Carolina Sheriff's Office. Detective J.L. Jackson was assigned to conduct an investigation. The investigation concluded on July 20, 2017, with no charges filed and the case was closed.

So what can you conclude from the fact that a months-long investigation was conducted, a detective was involved, just like the detective who testified here, the detective went out and tried to track down what was going on with the accusations that were being made, and ended up closing an investigation?

What can you conclude from that about the credibility of [R.R.] and whether whatever she was saying was able to be backed up, whether there were witnesses, whether there were documents like signing somebody out of school, which [R.R.] says [Appellant] was coming there and signing her out of school?

Now, if the detective saw that, what do you think the conclusion would be of the investigation?

N.T., 4/20/23, at 106-07.

- 11 -

After closing arguments concluded, and outside of the jury's presence, the Commonwealth objected to Appellant's argument related to the stipulation. At that time, the trial court stated its concerns:

> What concerns [the court] more are the repeated arguments about the opinions and conclusions of North Carolina's D[H]HS and police department[.] … [The court] thought [it was] pretty clear in discussing the motion *in limine* that the jury was not to be presented with any evidence or arguments about anybody else's opinions.
>
> That is notwithstanding the parties' stipulation that an investigation occurred and nothing happened as a result. That allows for plenty of leeway without crossing the line, and here the line was crossed probably a dozen times[. The court] believe[s] that requires a curative instruction from [the court] reminding the jury that the asserted opinion or conclusions of any person, entity or institution are not evidence in this case and should not be considered because they are not part of the evidence in this case and any such evidence should be disregarded.

*Id.* at 146-47. The trial court further stated,

> there was a stipulation here that no further action was taken after the investigation, and you can argue for inferences.
>
> … [The court] understand[s] that a lot of argument is permissible pursuant to that stipulation. But here the way it was stressed[,] and coupled with comments of false accusations, it's virtually, if not outright, telling them that the police department and D[H]HS concluded nothing was to be done.
>
> You had plenty to work with, and [the court] think[s] you went further.

*Id.* at 149.

The trial court ultimately addressed the stipulation, and issued the following jury instruction:

> Since we cannot test opinions or outside conclusions in this way,

they are not part of the trial evidence. Consistent with this instruction, [the court] **specifically instruct**[**s**] **you to disregard any argument that would be based on the opinion or asserted opinion of any agency, person, or entity, including the North Carolina Sheriff's Department or** [**DHHS**] **of North Carolina.**

*Id.* at 169-70 (emphasis added).

In rejecting Appellant's claim of an improper jury instruction, the trial court explained that

[t]he purpose of the evidence, introduced by stipulation[,] was two-fold: to demonstrate that the complainant had made certain allegations in North Carolina, that investigations ensued, and that no further action was taken. However, defense counsel attempted to take the stipulated evidence an impermissible step too far, by encouraging the jury to conclude investigators in North Carolina had not found [R.R.] credible, and that they should adopt those alleged credibility determinations [at] Appellant's trial. This was an attempt to usurp the jury's role. Despite the court's warnings to defense counsel, he insisted on taking this path, leaving the court no choice but to follow through on its promise to caution the jury. There was no error in doing so.

Trial Court Opinion, 9/29/25, at 14. We agree with the trial court's sound reasoning and legal conclusion, as stated above, and discern no error or abuse of discretion. Even if Appellant had not waived this claim, we would conclude it lacks merit for the reasons stated in the trial court's opinion. *See id.*

In his third and final issue, Appellant challenges the verdict as against the weight of the evidence. Appellant's Brief at 27. Appellant argues that "the evidence was not merely incredible[;] the evidence tending to prove that Appellant sexually abused R.R. was inconsistent and contrary to the additional evidence presented during the case." *Id.* Appellant claims he presented

uncontroverted character evidence "of his excellent reputation for being a law-abiding, non-violent, and peaceful person." *Id.* Appellant asserts that he was a father to a son and daughter, "along with two stepdaughters, who had never been convicted of a crime," and that he had a reputation for being a law-abiding, non-violent, and peaceful person." *Id.* at 28. Appellant alleges that character evidence can create reasonable doubt for the fact-finder. *Id.*

Appellant argues that R.R.'s testimony was not compelling or credible, when viewed with the other trial evidence. *Id.* In particular, Appellant "offered compelling evidence" through the stipulation and the testimony of Charon and Tatinia Warren (Tatinia). *Id.* Appellant asserts that the record establishes that "R.R.'s testimony was not only inconsistent[,] but also not credible." *Id.* In particular, Appellant points out that in August 2016, when Appellant and R.R. visited Tatinia's home, there were nine to ten people present, including Appellant and R.R. *Id.* Appellant argues that R.R.'s account of what happened "does not comport with the reality of all these individuals sharing a one-bathroom house that evening." *Id.*

Appellant also points to R.R.'s testimony regarding the events that took place at Tatinia's second residence on Memphis Street in Philadelphia. *Id.* at 29. Appellant claims the evidence showed R.R.'s claim of an assault at that location to be impossible, because the Memphis Street residence was rented and occupied by a tenant at the time. *Id.* Appellant cites evidence

demonstrating that R.R. never went to the Memphis Street residence in August 2016. *Id.*

Appellant directs our attention to Charon's testimony that R.R. had a motive to lie, because R.R. "wished to leave her older sister and Appellant behind, and return to Philadelphia." *Id.* Appellant also directs our attention to R.R.'s social media post indicating that she "could care less if [Charon] stops breathing 2 second from now." *Id.* For these reasons, Appellant argues that the verdict is against the weight of the evidence. *Id.* at 30.

Our standard of review is well-established:

The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.

….

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. To successfully challenge the weight of the evidence, a defendant must prove the evidence is so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Arias*, 286 A.3d 341, 352 (Pa. Super. 2022) (quotation marks and citations omitted). Moreover,

when a weight challenge is predicated on the credibility of trial testimony, [appellate] review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review. Any conflicts in the evidence or contradictions in

- 15 -

testimony are exclusively for the fact-finder to resolve. Finally, …
[b]ecause the trial judge has had the opportunity to hear and see
the evidence presented, an appellate court will give the gravest
consideration to the findings and reasons advanced by the trial
judge when reviewing a trial court's determination [whether] the
verdict is against the weight of the evidence.

***Commonwealth v. Wallace***, 244 A.3d 1261, 1276 (Pa. Super. 2021)

(citations and quotations marks omitted).

A person commits the crime of IDSI if he

engages in deviate sexual intercourse with a complainant … who
is less than 16 years of age and the person is four or more years
older than the complainant and the complainant and person are
not married to each other.

18 Pa.C.S.A. § 3123(a)(1) (paragraph breaks and designations omitted).

A person commits the crime of statutory sexual assault when that

person "engages in sexual intercourse with a complainant to whom the person

is not married who is under the age of 16 years and that person is … four

years older but less than eight years older than the complainant[.]" 18

Pa.C.S.A. § 3122.1(a) (paragraph break and designations omitted).

A person commits the crime of unlawful contact with a minor if,

the person is intentionally in contact with a minor, … for the
purpose of engaging in an activity prohibited under any of the
following provisions under this title, and either the person
initiating the contact or the person being contacted is within this
Commonwealth …[a]ny of the offenses enumerated in Chapter 31
(relating to sexual offenses).

18 Pa.C.S.A. § 6381(a)(1.2) (paragraph breaks and designations omitted).

The Crime Code defines the crime of EWOC, in relevant part, as follows:

> A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a)(1). We note that "a solitary witness's testimony **may** establish every element of a crime, assuming that it speaks to each element, directly and/or by rational inference." **Commonwealth v. Martin**, 323 A.3d 807, 820 (Pa. Super. 2024) (emphasis in original) (citation omitted).

At trial, the Commonwealth presented the testimony of R.R. R.R. testified that she was born in Philadelphia, but moved with her mother to Levittown "when I was in the fourth grade." N.T., 4/19/23, at 71-72. At the age of 13, R.R. moved back to Philadelphia, where she lived with her oldest brother and Charon, her sister. **Id.** at 72. When R.R. was 14 years old, she moved with Charon to North Carolina. **Id.** R.R. explained that she was sent to live in North Carolina because her mother was dying of cancer, "and I had moved down there before she got ill." **Id.** at 80. While in North Carolina, R.R. lived with Charon, Appellant, "someone from [Charon's] college," and Charon's four children. **Id.** at 75. R.R. moved back to Philadelphia when she was 15 years old. **Id.** at 72. In Philadelphia, R.R. lived with Charon, Appellant, two of R.R.'s older brothers, R.R.'s sister (Julie), and R.R.'s mother.[4] **Id.** at 73.

_____

[4] R.R. testified that "[m]y mom has six kids, my dad had 13, and they shared three. Including me, they shared three." N.T., 4/19/23, at 74.

R.R. explained that when Charon married Appellant, she was not very close to him: "[I]t wasn't too much of a relationship. Like [Appellant] was family, but … he wasn't my actual brother. … [W]e weren't close or anything." *Id.* at 77.

R.R. testified that while the family moved to North Carolina, they lived in a trailer home with five bedrooms and three bathrooms. *Id.* at 78. Charon testified that she had a close relationship with her sister, and that Charon "was the closest thing to a mother that I had." *Id.* at 81. R.R. stated that her mother passed away on April 11, 2016. *Id.*

R.R. testified regarding Appellant's assault of R.R. in North Carolina. According to R.R.,

> I was in the guest room with [Charon]. She told me to go and ask [Appellant] about the remote when [Appellant] was in the master bedroom.
>
> I went and asked [Appellant] about the remote and … he was laying in the bed. I was kind of over top of him. He pulled my breast out of my shirt and took a picture, and I walked out of the room.

*Id.* at 82. R.R. testified, when she was 15 years old, Appellant "would touch my breasts, my vagina, my butt, different inappropriate places." *Id.* at 84. According to R.R., Appellant would use his hand, his mouth, and his penis to touch her. *Id.* at 85. R.R. testified that Appellant put his penis "[i]n my vagina, primarily[.]" *Id.* at 85-86. R.R. claimed that this took place "[a] lot." *Id.* at 86.

R.R. testified that in August of 2016, she and her family attended a family reunion in Jacksonville, Florida. *Id.* After the family reunion, they "went back home to North Carolina. My sister and nephew stayed back, and the rest of us went to Philadelphia." *Id.* at 86-87. According to R.R., the "rest of us" included her niece, and her brother and other sister Julie. *Id.* at 87. Upon reaching Philadelphia, they dropped off R.R.'s sister and brother in West Philadelphia, and drove to the home of Appellant's sister. *Id.* Upon reaching that home, R.R. went up to an unoccupied nursery, where Appellant subsequently joined her. *Id.* at 88. R.R. described what next transpired:

> [Appellant] started to like kind of take my clothes off. Then [Appellant's] sister knocked at the door. She handed him a sheet, closed the door, and then he took my pants off. He took my pants off, and he was like licking my butt and my vagina.
>
> ….
>
> And then [Appellant] put his penis inside of me and then … like sexual action with him in my vagina.

*Id.* at 88-89. Appellant then ejaculated on the carpeted floor. *Id.* at 89. R.R testified that Appellant "always wore [] a white T-shirt. He wiped the carpet with it, and that was the sexual act that night." *Id.*

R.R. testified that at the time of Appellant's actions, her five-year-old niece was inside of the nursery, in a "tent, like tepee kind of thing." *Id.* at 90, 163. According to R.R., her niece "was on the phone in the beginning, but then she did fall asleep." *Id.* R.R explained that

> [w]hen we came in the room, it was me and [the niece.] [Appellant], I believe, had went to the restroom.

- 19 -

> We came in the room, and she was using [Appellant's] phone. She went to the tepee. I was laying down. [Appellant] came in the room, and then kind of not too long after that, somebody knocked on the door, [and] gave us a sheet. Pretty much after that, the abuse started.

*Id.* at 164. The next day, R.R. recalled, they left to travel back to North Carolina. *Id.* at 90-91. R.R. acknowledged that these kind of activities continued to occur. *Id.* at 91.

R.R. testified that the North Carolina DHHS came to the house. *Id.* R.R. explained DHHS came to the house because she had complained to her family about a lack of food. *Id.* at 92. While DHHS was at the house, R.R. did not report Appellant's actions. *Id.* at 91. R.R. explained that

> [w]hen D[H]HS came to the house, they questioned me in like an open room. It wasn't the family room. It was the living room and people were still going as the day was just regular. Like it wasn't like private or anything.
>
> But [Appellant] was in the family room, and there was just an open area for everything, and I … didn't feel comfortable. I did express like, "I don't want you to leave me here, sir."
>
> ….
>
> I told her that I didn't want her to leave me there. She told me with the report, there was nothing she could do. Like she didn't have any reason to take me from the home.

*Id.* at 91-92.

R.R. testified that she first reported Appellant's actions to her cousins, when they spent Christmas 2016 in Philadelphia. *Id.* at 94. At the time, R.R. showed her cousins a December 20, 2016, text message from Appellant. *Id.*

at 95-96. R.R. read the text message: "'OMW,' which stands for on my way, 'Take everything off.'" *Id.* at 96. R.R. explained that this meant Appellant "was on his way home and to take off my clothes." *Id.* On December 31, 2017, Veronica took R.R. to the police, where they reported the incident. *Id.* at 98. R.R. testified that police told her "that since it all didn't happen here, that I couldn't report it here and it has to be reported in North Carolina where it happened." *Id.* R.R. testified that someone else made the report in North Carolina.[5] *Id.* at 98-99.

When asked why she did not report Appellant's first assault, R.R. stated that

> I was scared. … [L]ike I had lost my virginity. It was never sexually to this extent. Like when I lost my virginity, given all information about it, it was in a school yard and it was probably two minutes. It wasn't nothing serious sexual [*sic*].
>
> I kind of was in shock. I didn't know how to react, and … I never wanted to let my sister down.
>
> I used to talk to my niece, the oldest who lived there. I used to talk to her about it, and she was like, "You have to tell my mom. She's the only one who can help you."
>
> She just kept saying, "I can't help you. She's the only one who can help you," but I couldn't talk to my sister about it. I just – I couldn't.

_____

[5] R.R. denied making a police report, but stated that she spoke with a detective in North Carolina. N.T., 4/19/23, at 106-07.

*Id.* at 100. R.R. testified that she made the report in Philadelphia because "I was with my cousin and I just knew I was safe, like nothing bad could happen for me." *Id.*

Regarding discrepancies in R.R.'s prior testimony regarding the address where the assaults took place, R.R. explained that when she first testified, she did not know the Philadelphia address, but someone later gave her the address. *Id.* at 134. R.R. further acknowledged that she had behavioral issues at school. *Id.* at 137.

R.R.'s cousin, T., who was 21 years old at the time of trial, also testified. *Id.* at 169, 170. T. testified that R.R. is her first cousin and she has known R.R. her whole life. *Id.* at 170. T. confirmed that on December 31, 2016, R.R. disclosed Appellant's assaults. *Id.* at 171-72. According to T., R.R. "showed me text messages between the two of them, … and as I was reading the conversation, I felt as though it was very inappropriate." *Id.* at 172. T. and R.R. went downstairs and T. told Veronica about Appellant's assaults. *Id.* At that time, Veronica took R.R. to the police station. *Id.* at 174.

Philadelphia Police Detective Randy Modres (Detective Modres) testified that he interviewed R.R. on July 10, 2019. *Id.* at 197. Detective Modres stated that R.R. denied to him that she made a police report in North Carolina. *Id.* at 203.

Tatinia testified that in August 2016, she lived at 2137 Pratt Street in Philadelphia. N.T., 4/20/23, at 16. At the time, Tatinia lived with her wife

and two-year-old daughter. *Id.* Tatinia testified that Appellant visited her on July 31, 2016. *Id.* at 17. According to Tatinia, Appellant "was traveling all the way from Florida and wanted to rest before he headed back home." *Id.* Appellant was accompanied by "a little girl and his daughter." *Id.*

Tatinia testified that Appellant remained at the residence for a "couple hours." *Id.* Tatinia also identified and described photographs of the room where the assault occurred:

> This one shows my daughter laying on her rug. It is a very thick rug. This particular rug prevented the door from closing. You couldn't close the door with this rug being in her room; so the door always stayed open.

*Id.* at 20. Tatinia later stated the carpet was not glued down. *Id.* at 36.

Tatinia confirmed that in 2016, she owned a house on Memphis Street, which was rented to Anice Ali. *Id.* at 23. Tatinia further confirmed she did not live at that address. *Id.* at 24.

Tatinia testified that the night of July 31, 2016, five or six people, who had participated in a fashion show, stayed at her home. *Id.* at 28. These people stayed downstairs in the living room. *Id.* Tatinia testified that people were going up and down the stairs throughout the night, to use the bathroom. *Id.* at 30. Tatinia, too, would go upstairs to check on the children. *Id.* Tatinia stated that she never saw her child playing on the phone. *Id.* at 37. Tatinia acknowledged that she fell asleep at some point that night, "maybe like a little after 12:00 midnight to 1:00." *Id.*

Charon testified that she is Appellant's wife. *Id.* at 42. Charon testified that R.R. came to live with her family when her mother was ill. *Id.* at 44. Charon testified that she treated R.R. like a member of the family. *Id.* at 46. Charon also described R.R.'s difficulties in her school work and behavior. *Id.* at 48.

Charon stated that R.R. began acting out "when I told her that she couldn't stay the summer in Philadelphia." *Id.* at 49. Charon became aware of a complaint by R.R. regarding the lack of food in the house. *Id.* at 51. According to Charon, in December 2016, a social worker investigated the incident, interviewing everyone in the house. *Id.* at 51, 57. When asked whether there was anyone else in the room during the social worker's interview of R.R., Charon responded, "To my knowledge, no. I was in another room. The social worker made me and my husband go into our bedroom." *Id.* at 52. To Charon's knowledge, no one was walking in and listening to the social worker's interview. *Id.* at 53.

The parties stipulated that if Appellant were to call Aisha Danyan Allen to the stand,

> she would testify that she has known [Appellant] for many years, knows other people who know him, and among those people, [Appellant] enjoys a reputation as a law-abiding, peaceful, nonviolent person.

N.T., 4/20/23, at 84.

We cannot conclude, based on the evidence detailed above, that the trial court abused its discretion in denying Appellant a new trial on his weight

- 24 -

claim. While R.R.'s testimony conflicted with other witnesses, "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Anderson*, 323 A.3d 744, 757 (Pa. 2024). Any conflicts in the evidence or contradictions in testimony are exclusively for the fact-finder to resolve. *Commonwealth v. Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012). As the trial court explained in its opinion,

> the jury carefully weighed the evidence and credited the testimony as to Appellant's conduct in reaching its verdicts. Having observed the witnesses and the other evidence of guilt, the [c]ourt's conscience is not at all shocked by those verdicts. To the contrary, the verdicts are consistent with the overwhelming weight of the credible evidence.

Trial Court Opinion, 9/29/25, at 8. Consequently, Appellant's weight claim merits no relief. We therefore affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/13/2026

- 25 -